UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re UBS AUCTION RATE | ) | |
| SECURITIES LITIGATION | ) | **Master File No. 08-cv-02967 (LMM)** |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |
| | ) | |

**DECLARATION OF JOEL P. LAITMAN IN SUPPORT OF PLAINTIFFS'**
***KASSOVER, ET AL. v. UBS AG, ET AL.* MEMORANDUM OF LAW IN**
**OPPOSITION TO ARIC A. STREIT'S AND MARY STREIT'S MOTION**
**FOR CONSOLIDATION, APPOINTMENT OF LEAD PLAINTIFF AND**
<u>**SELECTION OF LEAD COUNSEL AND IN SUPPORT OF COORDINATION**</u>

**SCHOENGOLD SPORN LAITMAN &**
**LOMETTI , P.C.**
Samuel P. Sporn (SPS-4444)
Joel P. Laitman (JL-8177)
Frank R. Schirripa (FS-1960)
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile (212) 267-8137

*Attorneys for Plaintiffs in*
*Kassover, et al. v. UBS AG, et al.*

**RONALD KASSOVER, et al, on behalf**
**Of himself and all others similarly**
**Situated,**

                **Plaintiffs,**

    **vs.**

**UBS AG and UBS FINANCIAL**
**SERVICES, INC.,**

                **Defendants.**

**Case No. 08-cv-2753 (LMM)**

---

**RANDOLPH BONNIST, Individually**
**and On Behalf Himself and All Others**
**Similarly Situated,**

                **Plaintiffs,**

    **vs.**

**UBS AG and UBS FINANCIAL**
**SERVICES, INC.,**

                **Defendants.**

**Case No. 08-cv-4352 (LMM)**

I, JOEL P. LAITMAN hereby declare under penalty of perjury the following:

1.      I am a member of the law firm of Schoengold Sporn Laitman & Lometti, P.C. ("SSLL" or "Lead Counsel"), counsel for Plaintiffs in *KASSOVER, et al. v. UBS AG and UBS FINANCIAL SERCVICES, INC*, No. 08-cv-2753 (S.D.N.Y.).  I submit this declaration in support of the *Kassover* Plaintiffs' opposition to the motion of Aric A. Streit and Mary Streit as Trustees for the Benefit of the Streit Living Trust for Consolidation, Appointment of Lead Plaintiff and Approval of Lead Plaintiffs' Selection of Co-Lead Counsel and in support of coordination.

2.      Attached hereto as Exhibit A is a true and correct copy of the Amended Complaint filed in the *Kassover* action on May 27, 2008.

3.      Attached hereto as Exhibit B is a true and correct copy of Plaintiffs' First Request for the Production of Documents from UBS Defendants, in the *Kassover* action, as served on the UBS Defendants on May 27, 2008.

4.      Attached hereto as Exhibit C is a true and correct copy of this Court's May 16, 2008 Order consolidating *Chandler, et al. v. UBS AG, et a*l, No. 08-cv-2967 (LMM); and *Sanchez, et al. v. UBS AG, et al.*, No. 08-cv3082 (LMM).

I hereby declare under the laws of the United States, and under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: June 9, 2008

         /s/ Joel P. Laitman
        Joel P. Laitman

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

RONALD D. KASSOVER, CHRIS JONES    :
STEPHEN M. MITTMAN, RONALD E.    :   No.    08-cv-02753 (LMM)
KLOKKE, JAN SCHNEIDER, MARJORIE    :
ELLIOTT, RITA TUBIS and HELENA TUBIS    :   ECF CASE
on behalf of themselves and all others similarly    :
situated,    :   **AMENDED CLASS ACTION**
   :   **COMPLAINT**
           Plaintiff,    :
   :
       v.    :   JURY TRIAL DEMANDED
   :
UBS AG and UBS FINANCIAL SERVICES, INC., :
   :
        Defendants.    :

--------------------------------------------------------------x



## NATURE OF THE ACTION

1.     Plaintiffs Ronald D. Kassover, Chris Jones, Stephen M. Mittman, Ronald Klokke,

Jan Schneider, Marjorie Elliott, Rita Tubis and Helena Tubis (collectively "Plaintiffs") clients of

UBS AG's brokerage subsidiary, UBS Financial Services, Inc., bring this class action on behalf

of themselves and all others similarly situated, by their attorneys, Schoengold Sporn Laitman &

Lometti, P.C., for their class action complaint against defendants UBS AG and UBS Financial

Services, Inc. ("UBS"), a registered investment advisor under the Investment Advisers Act of

1940, 15 U.S.C. § 80b-1, *et seq.* ("IAA"), (collectively, the "Defendants"). The action is brought

on behalf of UBS clients, as set forth more specifically herein, who have had the auction rate

preferred stock or auction rate debt securities ("ARS") frozen by UBS and have been damaged

thereby.

2.     ARS are complex long-term debt securities where the yield or interest rate is reset

at periodic auctions held every week or month at which time the instruments may also be sold.

ARS are not traded on any national exchange. The liquidity of the ARS depended on the

functioning of these auctions, and the auctions, in turn, depended on the continued participation

of certain primary financial institutions who pledged to support them. UBS pledged to act as a

primary institution supporting the ARS auctions for Plaintiffs' ARS holdings. This auction

participation yielded UBS substantial special annual fees (which UBS continues to receive even

though, as alleged below, UBS has ceased its participation in the auctions to the detriment of its

clients).

       3.     The investment of Plaintiffs' cash holdings in ARS was the result of a systematic

advisory campaign engaged in by UBS as Plaintiffs' Financial Advisors. UBS's undisclosed

motivation for this advisory campaign was in order for UBS to obtain the substantial undisclosed

auction related annual fees. Plaintiffs were each approached by their UBS "Financial Advisor"

who proposed and recommended that they be given consent to invest Plaintiffs' cash holdings in

ARS. Plaintiffs' UBS Financial Advisors recommended ARS as a higher yielding "cash

alternative" to other liquid investments such as money market funds. UBS Financial Advisors

failed to advise Plaintiffs and the Class of either the potential absence of liquidity attendant with

ARS investments or any conflicts of interest between Plaintiffs' financial interests and those of

UBS in connection with the ARS. Further, Defendants conducted this advisory campaign

without reference to or direction that Plaintiffs review any portion of ARS prospectuses or

registration statements filed with the United States Securities and Exchange Commission

("SEC"). Plaintiffs and members of the applicable classes herein were thus induced to give their

consent to their UBS Financial Advisor to invest in ARS without being shown the applicable

ARS's prospectuses or registration statements filed with the SEC and without being advised of

the potential absence of liquidity attendant with the ARS investment or the fundamental conflicts

interest between their ARS holdings and the activities of UBS as a principal ARS auction

participant.

4.     Further, independent of the above specific misstatements and omissions made by UBS Financial Advisors to Plaintiffs in connection with the ARS, Defendants, as Plaintiffs' Financial Advisors, owed Plaintiffs and the Class duties not to take affirmative steps to undermine its clients' financial interests or advance UBS's financial interests at the expense of its clients.

5.     Beginning on or about February 13, 2008, UBS determined that it was no longer in its own financial interest to continue participating in ARS auctions. In breach of the duties owed to Plaintiffs as Financial Advisors, Defendants ceased all ARS auction participation. UBS's actions ensured that the liquidity of their clients' ARS holdings was wiped outm causing Plaintiffs' ARS holdings to become frozen.

6.     Plaintiffs assert seven causes of action arising from Defendants' misconduct alleged herein. It is alleged UBS violated the IAA (Count I) by, *inter alia*, misrepresenting the liquidity of the ARS investment, in failing to disclose liquidity risks and conflicts of interest attendant with the ARS investment (e.g., ¶¶ 3, 34-35) ("misrepresentation and omission allegations") and for failing to participate in the ARS auctions as pledged in order to advance defendants' financial interests at their clients' expense (e.g., ¶¶ 4, 39) ("breach of duty allegations"). Plaintiffs Mittman, Klokke and Elliott also allege on behalf of themselves and all holders of ARS not filed or registered under the Investment Company Act of 1940 claims against UBS for violations of New York General Business Law § 349 (Count II) and negligent misrepresentation (Count III) arising from both the misrepresentation and omission allegations as well as allegations of breach of duty. Finally, all Plaintiffs allege claims for breach of fiduciary duty against UBS (Count IV), aiding and abetting breach of fiduciary duty against UBS AG

3

(Count V), breach of the implied covenants of good faith and fair dealing (Count VI) and negligence (Count VII) against UBS arising *exclusively* from the breach of duty allegations (e.g., ¶¶ 4, 39). Each Plaintiff herein relied on Defendants' purported role as a trusted Financial Advisor as alleged herein.

7.     Plaintiffs' allegations are based upon knowledge as to themselves and upon information and belief based upon, among other things, the investigation of their attorneys, including, a review of Defendants' public documents, filings with the SEC, applicable statutes, rules and regulations, communications by Defendants, and news articles and information readily obtainable on the Internet.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to alleged violations of Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*, Section 349 of the New York General Business Law ("GBL"), breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, and the implied covenant of good faith and fair dealing, as well as common law negligence and negligent misrepresentation.

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as one of the causes of action arose from Defendants' violation of federal law, *i.e.*, the Investment Advisers Act, 15 U.S.C. 80b-14. Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d) (diversity). Although, some of the Plaintiffs are citizens of New York, residing in this District, other members of the proposed Class numbering hundreds of thousands are citizens of a State different from any of the Defendants. *See* 28 U.S.C. § 1332(d)(2)(A). The matter in controversy exceeds the sum of $5,000,000,

exclusive of interests and costs. To the extent the court has federal question jurisdiction, it also has supplemental jurisdiction over the state law claims.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the Defendants participation in the ARS auction market occurred in this District. Further, venue is proper in this District pursuant to 15 U.S.C. § 80b-14. Each of the Defendants resides, is found, transacts business, or has an agent in this state and/or this District. Defendants UBS AG and UBS Financial Services, Inc. maintain offices located at 299 Park Avenue, New York 10171.

11.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the internet and the facilities of the national securities markets.

## PARTIES

12.    Plaintiff Ronald D. Kassover ("Kassover"), resides in Nassau County, New York. Mr. Kassover at all times hereinafter mentioned maintained and continues to maintain an Individual Retirement Account ("IRA") with Defendant UBS.   Mr. Kassover's UBS Financial Advisor recommended advised and falsely obtained Mr. Kassover's consent to allow the investment advisor to invest $200,000 cash in the following ARS holdings:  Eaton Vance Ltd Duration Income Fund; and the Nicholas-Applegate Convertible & Income Fund II. As a result of Defendants' breach of duty and misconduct, all of Kassover's ARS assets were frozen and only a portion has been subsequently redeemed.

13.    Plaintiff Chris Jones ("Jones") resides in Orange County, California.   Mr. Jones at all times hereinafter mentioned maintained and continues to maintain a brokerage account

with Defendant UBS.    Mr. Jones's UBS Financial Advisor recommended, advised and falsely obtained Mr. Jones' consent to invest $1.85 million of Mr. Jones' cash in the following ARS holdings:    National Collegiate Student Loan Trust 2007-4; Pennsylvania Higher Education Assistance Agency ARCs Series C; Massachusetts EDL Financing Authority ED Loan Revenue Series 2007-D; Iowa Student Loan Liquid Revenue E-I RV; Missouri Higher Education Loan Authority 28D-J.  As a result of Defendants' breach of duty and misconduct all of Jones' ARS assets were frozen.  On or about April 4, 2008, Mr. Jones was forced to sell his ARS holdings in a private transaction at a loss in order to meet liquidity needs.

14.    Plaintiff Stephen M. Mittman ("Mittman") resides in New York County, New York.  Mr. Mittman at all times hereinafter mentioned maintained and continues to maintain an account with Defendant UBS.    Mr. Mittman's UBS Financial Advisor recommended, advised and falsely obtained Mr. Mittman's consent as alleged herein in order to allow the Financial Advisor to invest $250,000 of Mr. Mittman's cash in the following ARS holdings: New York City Transit Authority Metropolitan Transportation Authority Tri-borough Bridge and Tunnel Authority Revenue Subseries 2004 Series A-4 CUSIP: 649713CK8; and New York City Transit Authority Metropolitan Transportation Authority Tri-borough Bridge and Tunnel Authority Revenue Subseries 2004 Series A-5 CUSIP: 649713CJ1.    These securities were not listed or authorized for listing on a national exchange nor were these securities issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940.  As a result of Defendants' misrepresentations, omissions, breach of duties and misconduct all of Mittman's ARS assets were frozen.  On or about March 20, 2008, Mr. Mittman was forced to sell his ARS holdings in a private transaction at a loss in order to meet liquidity needs.

15.     Plaintiff Ronald E. Klokke ("Klokke") resides in New York County, New York. Mr. Klokke at all times hereinafter mentioned maintained and continues to maintain an account with Defendant UBS.   Mr. Klokke's UBS Financial Advisor recommended, advised and obtained Mr. Klokke's consent as alleged herein in order to allow the Financial Advisor to invest $100,000 of Mr. Klokke's  cash in the following ARS holdings: New York City Transit Authority Metropolitan Transportation Authority Tri-borough Bridge and Tunnel Authority Revenue Subseries 2004 Series A-4 CUSIP: 649713CK8.   This security was not listed or authorized for listing on a national exchange nor was this security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940.  As a result of Defendants' misrepresentations, omissions, breach of duties and misconduct all of Klokke's ARS assets were frozen.   On or about March 20, 2008, Mr. Klokke was forced to sell his ARS holdings in a private transaction at a loss in order to meet liquidity needs.

16.     Plaintiff Marjorie A. Elliott ("Elliott") resides in New York County, New York. Ms. Elliott at all times hereinafter mentioned maintained and continues to maintain an account with Defendant UBS.  Ms. Elliott's UBS Financial Advisor recommended, advised and obtained Ms. Elliott's consent as alleged herein in order to allow the Financial Advisor to invest $25,000 of Ms. Elliott's cash in the following ARS holdings: New York City Health & Hospitals Corporation ARC Ser C.   This security was not listed or authorized for listing on a national exchange nor was this security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940.  As a result of Defendants' misrepresentations, omissions, breach of duties and misconduct all of Elliot's ARS assets were frozen.

17.    Plaintiff Jan Schneider ("Schneider") resides in Fairfield County, Connecticut. Ms. Schneider at all times hereinafter mentioned maintained and continues to maintain an account and an IRA with Defendant UBS.    Ms. Schneider's UBS Financial Advisor recommended, advised and falsely obtained Ms. Schneider's consent to invest $150,000 of Ms. Schneider's cash in the following ARS holdings: ISAC Student Loan Revenue I Taxable ARCS 28-day reset.    As a result of Defendants' misrepresentations, omissions, breach of duties and misconduct all of Schneider's ARS assets were frozen.    On or about April 16, 2008, Ms. Schneider was forced to sell her ARS holdings in a private transaction at a loss in order to meet liquidity needs.

18.    Plaintiff Rita Tubis ("Rita Tubis") resides in New York County, New York.    Ms. Rita Tubis at all times hereinafter mentioned maintained and continues to maintain an account with Defendant UBS.    Ms. Rita Tubis's financial advisor caused her to invest $200,000 cash in the following ARS holdings: DNP Select Income Fund Inc. M7 Auction Preferred 3.853%; DNP Select Income Fund T7 Auction Preferred 3.880%; ING Clarion Global Real Estate Fund Day Series T Auction Preferred 3.288%; Nicholas Applegate Convertible and Income Fund II (Tuesday) 7-day Series B Auction Rate Preferred 3.543%; and Scudder RReef Real Estate Fund II Inc. (t) Series B Auction Preferred 4.862%.    As a result of Defendants' misrepresentations, omissions, breach of duty and misconduct all of Rita Tubis's ARS assets were frozen and only a portion has been subsequently redeemed.

19.    Plaintiff Helena Tubis ("Helena Tubis") resides in New York County, New York. Ms. Helena Tubis at all times hereinafter mentioned maintained and continues to maintain an account with Defendant UBS.    Ms. Helena Tubis's financial advisor caused her to invest $25,000 cash in the following ARS holdings: Kayne Anderson MLP Investment W7 Series B

8

Auction Preferred CUSIP 48660P302. As a result of Defendants' misrepresentations, omissions, breach of duty and misconduct all of Helena Tubis's assets were frozen.

20.     Defendant UBS AG ("UBS AG") and its subsidiaries offer a wide range of financial services and products worldwide. The Company's wealth management and business banking operations include the provision of a range of products and services for wealthy clients worldwide. These services range from asset management to estate planning and from corporate finance advice to art banking. UBS AG was responsible for Defendants' website and representations, including those relating to the duties of UBS Financial Advisors. UBS is a member of the NYSE and the NASD. UBS AG is headquartered at Bahnhofstrasse 45, Zurich, Switzerland, and has executive and branch offices in the United States and throughout the world. In New York, UBS AG's offices are located at 299 Park Avenue, New York, New York 10171.

21.     Defendant UBS Financial Services, Inc. ("UBS") is the brokerage subsidiary of Defendant UBS AG. UBS Financial is a registered investment advisor under the IAA. Defendant UBS Financial and maintains offices through the United States. In this District, UBS Financial is maintains offices at 299 Park Avenue, New York, New York 10171. Defendant UBS Financial, until the collapse of the ARS market had sustained an auction market for ARS. In order to maintain a fluid and efficient auction market, Defendant UBS Financial had a large proprietary inventory of ARS, and thus had a conflict of interest vis-à-vis Plaintiffs and the other members of the Class.

22.     Hereinafter, Defendants UBS AG and UBS may be referred to collectively as "Defendants" or the "UBS Defendants."

9

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class of UBS clients as more specifically defined in the counts alleged herein, who have had their ARS holdings frozen by UBS and have been damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs reasonably believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by UBS or its transfer agent and may be notified of the pendency of this action by mail, or the internet or publication using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of statutory and common law complained of herein.

26.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained Schoengold, Sporn, Laitman & Lometti, P.C., counsel competent and experienced in class and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Investment Advisers Act of 1940 was violated by Defendants' acts as alleged herein;

(b)    whether New York General Business Law §349 was violated by Defendants' acts as alleged herein in connection with ARS not registered under the Investment Company Act of 1940;

(c)    whether Defendants' breached its fiduciary and other duties owed to Plaintiff and other members of the Class, including by failing to participate in auctions UBS had pledged to support and thereby wiping out the liquidity of Plaintiff's ARS holdings;

(d)    whether Defendants' acts complained of herein were a breach of Defendants' implied covenants of good faith and fair dealing;

(e)    whether Defendants' acts complained of herein constituted negligence;

(f)    whether Defendants' statements and acts complained of herein constituted negligent misrepresentations in connection with ARS not registered under the Investment Company Act of 1940; and

(g)    to what extent Plaintiffs and members of the Class have sustained damages and the proper measure of damages.

28.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**Defendants Owed Duties To The Class As Registered**
**Investment Advisors And Financial Advisors**

29.    At all relevant times UBS Financial Services was a registered investment advisor. As of March 28, 2008, UBS Financial Services registered in excess of 8,900 employees who performed investment advisory functions.  (*See* UBS ADV Form, at 7).  Defendant UBS Financial Services provided "investment advisory services" to of 584,000 clients, of which in excess of 75% were individual clients, during 2007.  (*Id.*)

30.    As registered Investment Advisors and Financial Advisors, Defendants were obligated to advance the financial interests of their clients and not to permit their own financial interest to override the interests of their clients.  Defendant UBS held itself out a sophisticated and experienced financial and investment advisor and represented that it served as Plaintiffs' and the Class' "Financial Advisors."    Plaintiffs' monthly statements identified the name of Plaintiffs' Financial Advisor designated as "Your Financial Advisor."  Each Plaintiff relied on these representations.   In fact, UBS repeatedly and publicly assured Plaintiffs and the Class that as Financial Advisors UBS was focused first and foremost on the financial interests of their clients.  For example, Defendants' web site sets forth in detail the duties of UBS Financial Advisors – including, *inter alia*, to select the "most suitable solution" for Plaintiffs' financial needs as follows:



http://financialservicesinc.ubs.com/wealth/YourRelationshipWithUBS/TheUBSClientExperience
.html (last visited May 23, 2008) (emphasis added).

      31.    Defendants further publicly represented that part of the UBS "client experience"

was to consistently "support" the clients' financial needs:

> **The UBS Client Experience**
> ***Focused on you and your needs***
>
> ***The essence of the UBS Client Experience is to provide a framework that helps
> us consistently deliver the services you want to support your financial decisions.***
> We understand that wealth management is more than just the wide range of
> financial services and solutions you can access at UBS — it is how those services
> and solutions are developed and delivered to help you pursue your goals.
>
> ***That's why we offer a customized approach to wealth management, built on a
> personal relationship and shaped by an understanding of your needs and
> aspirations.*** To help manage your wealth, we harness the advisory and investment
> brokerage capabilities of one of the world's largest wealth management firms on
> your behalf.
>
> ***Our structured approach to helping you pursue your objectives*** is based on
> findings from discussions with our clients, our Financial Advisors, and extensive
> market studies.

http://financialservicesinc.ubs.com/wealth/YourRelationshipWithUBS/TheUBSClientExperience
.html (last visited May 23, 2008) (emphasis added).

## Defendants' Involvement In The ARS-Market

      32.    The ARS market emerged in 1984. It provided for safe investment in securities,

either bonds or preferred stock issued by municipalities and other creditworthy institutions or

public funds. The dividend or interest rate on these securities was reset at regularly scheduled auctions and these auctions also assured that if a holder wished to redeem or sell his holding he was able to do so. The liquidity of the ARS market was one of the principal benefits for ARS investors.

33.    During the Class Period, the Defendants were the second largest underwriter in the $330 billion ARS market. UBS's involvement in the ARS market had generated substantial revenue for Defendants. In addition to the customary brokerage fees UBS charges its clients in connection with their purchase or sale of ARS, UBS collected substantial fees in connection with running the auctions that re-set the weekly or monthly interest rates on the ARS.

## UBS's ARS Misstatements And Omissions As Financial Advisors

34.    Defendants engaged in a systematic advisory campaign as Plaintiffs' Financial Advisors promoting investment in ARS where UBS served as one of the primary auction participants. Plaintiffs and the Class were approached by their UBS Financial Advisors and induced to give their consent for UBS to invest Plaintiffs' cash holdings in ARS. Plaintiffs and the Class had no prior knowledge or understanding of ARS. Plaintiffs and the Class were not shown or directed to read any ARS prospectus, registration statement or other pertinent public filing. Plaintiffs and the Class were told that the ARS were as liquid as cash or money market funds such that the funds were accessible by Plaintiffs at all times. In addition, Plaintiffs' UBS Financial Advisors stated that in addition to having the same liquidity as cash the ARS had the advantage of earning higher yields than money market funds or other cash alternative investments. As a result of these materially false and misleading statements, as well as in reliance on their Financial Advisors' purported position to recommend investments to further their clients' financial interests Plaintiff gave their UBS Financial Advisor consent to invest in

14

UBS-supported ARS. Each month the UBS client account statements received by Plaintiffs reinforced the misleading statements regarding ARS's liquidity by prominently describing the ARS as "cash alternatives."

35. Defendants, acting as Plaintiffs' Financial Advisors, also failed to disclose to Plaintiffs and the Class the risk of illiquidity inherent in ARS in the event that primary auction participants such as UBS failed to participate in ARS auctions and also failed to disclose conflicts of interest between UBS and Plaintiffs.

**Auditors And The SEC Begin To Challenge "Cash"**
**Designation And Accounting Treatment For ARS**

36. As reported in an article titled "Auction-Rate Securities: Hold that Gavel" in CFO.com on April 25, 2005, "Big Four" auditor Ernst & Young ("E&Y"), in December 2004, first began advising clients to reclassify ARS as short-term investments and not "cash equivalents" as was the prior practice. E&Y's viewpoint was shared by the other Big Four audit companies and was endorsed by the Financial Accounting Standards Board ("FASB"), as follows:

                    *       *       *

> Since December, when Ernst & Young first began advising clients to make the change, scores of CFOs have altered the accounting treatment for ARS. The new interpretation of two accounting standards is now endorsed by the Financial Accounting Standards Board, the Securities and Exchange Commission, and the Public Company Accounting Oversight Board, as well as all the Big Four auditors. (The reinterpreted standards are FAS No. 95, Statement of Cash Flows, and FAS No. 115, Accounting for Certain Investments in Debt and Equity Securities.)
>
> A current SEC probe of the auctions, in which investigators are reportedly looking into alleged "bid rigging" within the ARS market, doesn't appear to involve accounting treatment of the securities. But the investigation led some audit clients to reevaluate their investments and later question the accounting treatment, according to an audit manager who preferred not to be identified. **After taking another look at the accounting rules, each of the Big Four concluded that a wholesale reinterpretation of the standards was needed, and the audit**

**firms passed the word to their clients.**

The accounting change might turn out be the latest crimp in corporate treasurers' use of what's long been seen as an effective cash-management tool. **The securities are long-term municipal and corporate bonds (usually with 20-year to 30-year maturities) that are priced and traded like short-term debt.**

**The reason for the resemblance to short-term debt is that ARS interest rates are reset through a Dutch auction.** In a Dutch auction, what sets the price is the bid with the lowest yield that would enable all the bonds in a single block to be sold. (A block of bonds is usually worth at least $200,000.) **Generally, the auctions are held every 7, 28, or 30 days, which gives finance executives a chance to liquidate their holdings when they need cash.**

(Emphasis added).

37.  The SEC and the Public Company Accounting Oversight Board ("PCAOB") have

followed E&Y and the other auditors to "correct" the wrong application of accounting rules, as

they relate to ARS.   As reported on February 28, 2005 article in iTreasurer.com titled "The

Brave New World of Regulatory Activism,"

*       *       *

Under reported pressure from the Public Company Accounting Oversight Board (PCAOB) and the SEC, audit firms have been revisiting decades-old (and apparently seldom read) literature on auction-rate securities—i.e., should they be counted as "cash equivalent" on the balance sheet or be classified as FAS 115 securities?

**Waiting for the (third) shoe to drop**

No one believes that the SEC and auditors are changing the rules. **The guidance on auction-rate securities, for example, dates back to the late 1980s.** And so far, the impact on corporate financials does not appear too dramatic. But these seemingly unrelated initiatives may be symptomatic of a common trend:

"There's greater scrutiny of how companies apply existing accounting rules and how auditors are enforcing them," explains PricewaterhouseCoopers Senior Manager, Muneera Carr. In the wake of Enron and the Sarbanes-Oxley Act, "regulators are clearly playing a more active role."

These latest moves are not the first show of standard-setters "activism." EITF 03-1 was also initially conceived as clarification of preexisting rules on impairment (SAB 59).

16

Later, however, the FASB reconsidered whether indeed it was doing more than clearing up some old misconceptions. Perhaps more worrisome, however, the February initiatives are not going to be the last: As *International Treasurer* was going to press, sources said a third accounting "bombshell" was to drop; this one "would blow the other two out of the water," one accounting pro notes.

**What if it walks like a duck. . .**

Just how auction-rate securities suddenly reemerged as a hot issue is murky, and **this is not the first time there's been some discussion of whether they belong in the "cash equivalent" line on the balance sheet. The buzz is that the PCAOB raised the issue during a routine inspection of a local audit practice of a Big-Four audit firm. The disagreement was escalated to the SEC Staff. And the SEC reaffirmed the guidance present in auditing manuals—i.e., auction-rate securities may look and feel like cash, but they are in effect FAS 115 securities.**

It's also not entirely clear why for years, companies have gone on classifying auction-rate securities as cash equivalents, and auditors accepted. (From a practical standpoint, the securities are nearly always as liquid as cash and have little price risk, hence the designation.)

What's crystal clear is why this has become an issue—now. With SOX-driven focus on compliance, auditors are carefully monitoring clients' financials. And with years of rising cash assets, and declining returns, many corporates have turned to auction securities to enhance yield with little—if any—additional liquidity or market risk.

At stake, then, is where to put auction-rate securities, if the apparently prevalent "cash equivalent" classification under FAS 95 is wrong. And the worry among corporate treasurers is that the new balance sheet "geography" may adversely affect key liquidity ratios.

*Experts at E&Y and PwC say that the "cash-like" designation for auction-rate securities was almost never correct.* For example, E&Y guidance dating back to 1991 explains why auction-securities should not be considered cash equivalents under FAS 95.

(Emphasis added).

38.  Despite seemingly clear guidance from the SEC, the Big Four audit firms and the PCAOB, Defendants continued to market ARS to Plaintiffs and other members of the Class as "Cash Alternatives" in violation of FAS No. 95 and FAS No. 115.

17

**Defendants' Duties As Financial Advisors**

39.     Acting as Plaintiffs' Financial Advisor and Investment Advisors under the IAA and as investment professionals bound by NASD rules described herein (¶¶ 53-57) and independent of any misstatements or omissions made to their Plaintiffs in connection with ARS, Defendant UBS was bound not to act in a manner which advanced Defendant UBS's financial interests at the expense of its financial advisory clients or which directly undermined the financial interests of its advisory clients.

**Defendants Breached Their Duties To The Class By Wiping Out Liquidity of Plaintiffs' ARS Holdings In Order To Advance UBS's Own Financial Interests**

40.     In early-February 2008, the Defendants breached their duties to Plaintiffs and the Class by failing to appear, provide bids and otherwise participate in the regularly scheduled auctions of Plaintiffs' ARS it had pledged to support.  These actions resulted in the collapse of the ARS market and caused Plaintiffs' ARS to become illiquid investments or frozen.

41.     As a result of the ARS market collapse in February 2008, Plaintiffs and other member of the Class could not sell their ARS holdings.  Unable to liquidate their ARS holdings to cash, Plaintiffs and other members of the Class were unable to meet their current financial obligations sustaining hardship and damages and forcing them to consider other alternatives to free up cash to meet current financial obligations.   Some Plaintiffs and members of the Class were forced to seek out buyers for their frozen ARS holdings and sell their holdings in an *ad hoc* secondary market at substantial discounts for purported "cash" investments – *e.g.*, 88% of face value.

42.     On February 26, 2008, *The Associated Press* issued an article entitled "Credit crunch turns Wall Street into a jungle," reported that investors and issuers, alike, "relied for years on the broker-dealer community supporting" the ARS auctions:

Consider the auction-rate securities market, where municipalities, student-loan authorities and others issue debt with interest rates that reset every week to 35 days in bank-arranged auctions. Big banks like Citigroup Inc. and Goldman Sachs surprised debt investors recently when they decided not to backstop auctions of securities that garnered little demand by bidding for some of the debt themselves.

*"We relied for years on the broker-dealer community supporting"* these securities auctions, says Paul Rosenstiel, deputy treasurer of California. *He said it was an "article of faith" that dealers would not let auctions fail. "We relied on and expected that kind of performance,"* he said.

*    *    *

"It's always been every investor for himself," says Mark Adelson, a principal of Adelson & Jacob Consulting LLC, which provides securitization consulting services. *"But their interests were not in conflict before and now they are."*

(Emphasis added).

43.    An early March 2008 document issued by Defendant UBS notified UBS's clients that "[c]hanges in market conditions have affected the pricing of some of these securities. Some [ARS] are now priced below par ...."    Finally, Defendant UBS advised its clients that, *"[a]s a result, investors looking to sell ARS securities should assume that it will take longer to do so."* (Emphasis added).

44.    On March 28, 2008, UBS advised its clients that it was marking down the value of the ARS securities held in its brokerage customers' accounts.    The markdowns, as reported, would range from a few percentage points to more than 20%.

## Federal And State Regulatory Authorities Initiate Investigations
## Into UBS's Role In Auction Rate Securities Market Failure

45.    A March 30, 2008 *New York Times* article entitled "If You Can't Sell, Good Luck" further exposed the UBS, and others, deception and breach of fiduciary duties:

*    *    *

Investors in these securities almost certainly relied on their brokers' assurances that the [ARS] were safe and sound. That's because the sales were not accompanied by prospectuses outlining the risks.

But the brokerage firms made more on these securities than they would have made on sales of money market funds.

19

46.    The *New York Times* article also reported that state securities regulators were investigating UBS:

> Regulators are also getting in on the act. On Friday, William F. Galvin, secretary of the commonwealth of Massachusetts, sent subpoenas to Merrill Lynch, UBS and Bank of America Investment Services seeking information related to their sales of auction-rate securities. "The inquiry is seeking to determine whether investors were properly informed of the risks that their investments might become illiquid." Mr. Galvin said in a statement.

47.    On April 8, 2008, *The Wall Street Journal* reported in an article "Auction-Rate Securities Probed" that the SEC and the Financial Industry Regulatory Authority ("FINRA") are starting to look into how brokers sold ARS products:

> *As scores of investors complain they were misled into buying now-illiquid auction-rate securities, the Securities and Exchange Commission and the Financial Industry Regulatory Authority are starting to look into how brokers sold the products.*
>
> In a survey sent in recent weeks to financial companies, Finra seeks a breakdown of total auction-rate-securities holdings by customer type, how auction-rate securities are classified on customer statements, and how firms marketed the products. The regulator also asks how many customer complaints about auction-rate securities the firms have received since Oct. 1. A copy of the survey was reviewed by The Wall Street Journal.
>
> Finra also recently started a "sweep" investigation into the topic. A sweep investigation is a broad look at industry practices; it doesn't necessarily mean enforcement action will take place.
>
> *SEC spokesman John Heine said the agency is working with Finra to look into "representations made to investors when they purchased auction-rate securities."*
>
> *      *      *
>
> *Massachusetts securities regulators also are concerned about sales practices. Last month they subpoenaed three large brokerage houses — UBS AG, Merrill Lynch & Co. and Bank of America Corp. — for documents and testimony on how they sold auction-rate securities to retail investors.*
>
> Merrill Lynch and UBS declined to comment about the subpoenas. *UBS is among the companies that received Finra's sweep letter.* Bank of America declined to comment.
>
> *      *      *
>
> *Brokers had pitched auction-rate securities as liquid, super-safe investments with interest rates slightly superior to those of conventional money-market*

*funds. Now investors are asking why they weren't warned about the possibility of failed auctions.*

(Emphasis added).

48.     On April 17, 2008, *The Wall Street Journal* reported in an article "New York Probes Auction Securities" that New York Attorney General Andrew Cuomo had launched a broad investigation into auction rate securities and had subpoenaed UBS for information:

> The Attorney General's office subpoenaed 18 institutions on Monday and Tuesday of this week, including some of Wall Street's biggest, such as UBS, Merrill Lynch and Goldman Sachs, according to a person familiar with the investigation. Mr. Cuomo's office has plans to send out additional subpoenas soon, says the person.
>
> Mr. Cuomo's office considers the investigation an "industry case," meaning officials are looking into all aspects of the auction-rate securities business – from what municipalities or other issuers were told about auction rates as methods of cheap financing all the way down to their distribution, sales and marketing to consumers who believed they were buying safe and easily sold investment.
>
> *     *     *
>
> Investors, including individuals and corporations who sought extra yield in what they believed a cash-like, or liquid, security, are now stuck with securities they can't sell. Some of the bonds failed auctions reset to higher rates, while others, depending on the terms of the bonds, reset to low rates even 0% in some cases.
>
> Mr. Cuomo's office isn't alone.
> State securities regulators are investigating auction rate securities as well, the North American Securities Administrators Association announced Thursday in a press release. The efforts will be coordinated through a task force led by Massachusetts Securities Division director Bryan Lantagne, and they include members from Florida, Georgia, Illinois, Missouri, New Hampshire, New Jersey, Texas and Washington, according to the release.

49.     On April 18, 2008, *Forbes.com* published an article entitled "Auction-Rate Securities: From Bad to Worse" that identified UBS as the lead culprit behind the ARS market collapse in February, 2008:

> Late on Thursday, nine U.S. state regulators announced they were setting up a task force to investigate the market for auction-rate securities (ARS), a $330 billion asset class that imploded during the credit meltdown, after being inundated

with complaints from investors since February. Had banks acted improperly when they sold these assets on to their clients, marketing them to their clients as safe, high-yielding, cash-on-demand securities, without disclosing the risks?

As demand for the bonds, resold at regular auctions, seized up, banks wrote down assets not only on the securities on their own books, but those of their clients as well. *Last month UBS, which has written down $800 million of its own $11 billion portfolio, also announced it was reducing the value of the securities in the accounts of its customers by "an average" of 5%. The bank had previously assured clients that the assets were safe.*

"Investors are telling state securities regulators that they did not know that their money was being held in auction-rate securities and were not advised about the liquidity risks," said Bryan Lantagne, director of the Massachusetts Securities Division and chairman of the task force. He said complainants ranged from "young families saving for a first home" to small business owners. "Their lives have been detrimentally impacted because the money they thought was liquid is now tied up in this frozen market."

Demand for auction-rate securities, the long-term bonds issued by governments and corporations, which have their interest rates reset at period auctions, soared over the past two decades, fueled by issuers who wanted to secure long-term financing at a low floating rate and buyers who were able to ignore the fundamental illiquidity of the assets because of the regular auctions.

*Though auctions began failing as early as last August, they came to the forefront after brokering banks such as UBS, which had previously bought the securities when auctions failed, refused to take any more on their books and began marking down the assets belonging to their customers.*

(Emphasis added.)

**Firms Such As UBS Reported To Continue To Reap Auction Fees While Failing to Participate In Auctions**

50.    On May 4, 2008, *The New York Times* published an article entitled "How to Clear A Road to Redemption" that exposed the clear conflict of interest for investment banks, like UBS, and the fees the investment banks continued to earn despite the fact that the auctions were failing:

It is Day 79 in the hostage crisis otherwise known as the auction-rate securities market. Some $300 billion worth of investors' funds -- advertised as being easy as

pie to cash in -- are still locked up. And the brokerage firms that got investors into this mess are doing little to help.

But investors trapped in these securities are not the only victims of this debacle; taxpayers are, too. That's because municipal issuers of auction-rate notes -- towns, school districts, hospitals, highway authorities and others -- are being asked to pay up to redeem and restructure the debt.

*Even as investors and taxpayers are hurt by this frozen market, Wall Street is making money from it. In fact, the auction-rate securities mess is another illustration of damaging conflicts of interest at the nation's big brokerage firms.*

Auction-rate securities are debt obligations issued by municipalities, nonprofit entities and closed-end mutual funds. Interest rates on the securities are set by periodic auctions, based on investor demand. The market froze in February when buyers disappeared, and brokerage firms refused to step in.

*Naturally, investment bankers who agreed to operate these auctions were paid for their services: 0.25 percent of the security's total issue for each year of its life. Unnaturally, big firms still earn these fees even though 70 percent of the weekly auctions of these securities are failing.*

*The firms also rake in banking fees when municipal issuers redeem the securities. They haul in another round of revenue when they help issuers unwind derivative contracts that are often intertwined with the securities.* These derivatives were designed to reduce costs for the issuers by hedging their interest rate risks. Thanks to the decline in interest rates, however, they can be frightfully expensive to unspool.

By my arithmetic, that's Wall Street 3, Investors/Issuers 0.

Sure, investors get interest on their  money --  but nowhere near enough to compensate for being stuck in their holdings.

(Emphasis added).

## UBS Offers Clients Loans With Interest On Their Frozen Assets To Continue To Profit From Failed ARS Market

51.     On May 5, 2008, *Investment News* published an article entitled "Brokerage firms struggle to finance auction-rate loans; Regulators provide some capital relief, but bank lenders balk," reported UBS would offer loans to its clients against ARS holdings at LIBOR plus a half-percent:

\*          \*          \*

*Retail brokers who have clients locked up in auction-rate securities generally aren't happy with the rates clients have to pay to borrow against their holdings.*

*They feel their firms have backed away from an implicit promise to ensure liquidity for these long-term securities that were sold as short-term, liquid investments.*

Brokers say customers should get a break. "It seemed like the interest rate was going to be fairly high," a broker at Wachovia Securities LLC of St. Louis said about the firm's loan program. "It didn't seem very attractive," said the representative, who asked not to be identified.

*      *      *

*UBS Financial Services Inc. of New York offers loans against ARPS at LIBOR plus a half-percent*, said Karina Byrne, a company spokeswoman.

(Emphasis added).

## UBS Refunded Over $35 Million To Massachusetts Attorney General For Massachusetts's Investment In ARS

52.    On May 7, 2008, *The Associated Press* published an article entitled "Mass. AG settles with UBS over risky investments," reporting that UBS would refund over $35 million to nineteen Massachusetts local governments and public agencies that had invested in ARS after being mislead "into believing that their investments were sufficiently low-risk...."

Nineteen Massachusetts local governments and public agencies will recover more than $35 million from investment bank UBS over risky investments that were intended to raise cash for public works projects, but soured amid turmoil in credit markets.

*Wednesday's settlement came three months after the state began investigating whether the Switzerland-based investment bank misled the governments into believing that their investments were sufficiently low-risk* to make them permissible for municipalities under state law.

Attorney General Martha Coakley, who announced the settlement with two units of parent firm UBS AG, said her office was still reviewing whether to propose additional penalties against UBS under the state's False Claims Act.

*A New York-based spokeswoman for UBS, Karina Byrne, said the firm agreed that the cities' and towns' investments in so-called auction-rate securities weren't allowed under state law.*

Byrne said UBS was pleased with the settlement, in which the company agreed to reimburse more than $35 million, representing the principal payments the municipalities initially made for their investments.

At issue are investments that UBS arranged for the local governments to acquire short-term bonds known as auction-rate securities, which were once considered

safe ways to borrow. But starting in February, weekly and monthly auctions at which investors normally purchase such investments failed to yield buyers, as investors sought to avoid risk amid turmoil in credit markets.

(Emphasis added.)

### Defendants Blatantly Violated NASD Requirement
### That Financial Advisors Proposed Transactions Be "Suitable"

53.     Defendant UBS is a member of the NYSE and the NASD.  As set forth on UBS's web site, "UBS [a foreign company] ... has voluntarily adopted the overwhelming majority of the NYSE Rules for US Companies."

54.     Defendants violated the bedrock principle of "know thy customer."  NYSE Rule 405, "Diligence as to Account" (commonly referred to as the "Know thy customer rule"), requires that "every member organization is required ... to (1) *Use due diligence to learn the essential facts relative to every customer*, every order, every cash or margin account ...." (Emphasis added).  In addition, NYSE Rule 342.17, "Review of communications with the public", states: "Members and member organizations must develop written policies and procedures that are appropriate for their business, their size, structure and customers in connection with the review of communications with the public relating to their business."  Further, NYSE Rule 472, Communications With The Public, sub-section (i) "General Standards for All Communications", states, in pertinent part: *"No member organization shall utilize any communication which contains (i) any untrue statement or omission of a material fact or is otherwise false or misleading, ..."* and sub-section (j), "Specific Standards for Recommendations," states in part that "[a] recommendation (even though not labeled as a recommendation) must have a basis which can be substantiated as reasonable."

55.     Defendants violated the most basic NASD requirement that the financial transactions proposed by "Financial Advisors" to their clients be *"suitable"* meaning that they

met the *"customers' financial objectives."* The false and deceptive marketing of ARS as "Cash Alternatives" was clearly "unsuitable" and could only serve to meet only Defendants' financial objectives at their clients' expense.

56.    The NASD has also promulgated "suitability" rules governing a broker's relationship with its customers. NASD Rule 2310 provides, *inter alia*, as follows:

### 2310. Recommendations to Customers (Suitability)

(a)    In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

(b)    Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make reasonable efforts to obtain information concerning:

(1)    the customer's financial status;

(2)    the customer's tax status;

(3)    *the customer's investment objectives; and*

(4)    *such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.*

(Emphasis added).

57.    Defendants' conduct in connection with their systematic campaign as Plaintiffs' Financial Advisors to promote investment in ARS also violated NASD Interpretative Materials for Rule 2310, which mandate "fair dealing," with the public including the requirement to not issue fraudulent misrepresentations and omissions in connection with financial transactions:

### IM-2310-2. Fair Dealing with Customers

(a)(1) *implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing.* Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with *particular emphasis on the requirement to deal fairly with the public.*

(2)    this does not mean that legitimate sales efforts in the securities business are to be discouraged by requirements which do not take into account the variety of circumstances which can enter into the member-customer relationship. *It does mean, however, that sales efforts must be judged on the basis of whether they can be reasonably said to represent fair treatment for the persons to whom the sales efforts are directed*, rather than on the argument that they result in profits to customers.

(Emphasis added).

## COUNT I

### Violation of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq.
(Against Defendant UBS Financial)

58.    Plaintiffs repeat and reallege the allegations as set forth above as if set forth fully herein.

59.    Defendant UBS Financial, who is and was at all relevant times an investment adviser under the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*, entered into contracts with Plaintiffs and other members of the Class to provide financial advice. Defendant UBS Financial, for compensation, engages in the business of advising Plaintiffs and other members of the Class, either directly or through publications or writings, as to the value of "securities" or as to the advisability of investing in, purchasing, or selling "securities" as defined at 15 U.S.C. § 80b-2(11).

60.    The provision of an auction market by UBS and the fees obtained as a result thereof are not incidental to the conduct of their usual brokerage business and Defendant UBS Financial receives special compensation therefore.

61.    Under the Investment Advisers Act, Defendant UBS Financial, as Investment

Advisers, owed to Plaintiffs and other members of the Class a fiduciary duty to not place their own interests before those of their clients, to refrain from any conflicts of interest and an affirmative obligation to employ reasonable care in serving their clients' financial interests.

62.    In breach of its duties, UBS Financial misrepresented that the ARS market was as liquid as a cash investment; failed to disclose the conflicts of interest inherent in the ARS investment and that the liquidity of the ARS investment depended on UBS Financial acting for the benefit of their clients as opposed to those of UBS Financial itself. In further breach of their fiduciary duties to Plaintiffs and other members of the Class in violation of the Investment Adviser Act, Defendant UBS Financial failed to continue to support Plaintiffs' ARS by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions wiping out the liquidity of Plaintiffs' ARS holdings.

63.    As a result of Defendant UBS Financial's fiduciary duty breaches, Plaintiffs' and other Class members' purchases, investment, or acquisition of ARS are void under Section 15 of the Investment Advisers Act, 15 U.S.C. § 80b-15(b), which provides:

> Every contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

64.    In addition to seeking a declaratory judgment that the ARS transactions with Plaintiffs and the Class are void, Plaintiffs seek to restore Plaintiffs' financial position held prior to UBS's freezing of Plaintiffs' ARS holdings and any other remedies permissible under the

Investment Advisers Act.

## COUNT II

### Violation of the New York General Business Law § 349
(Against Defendant UBS Financial)

65.      Plaintiffs Mittman, Klokke and Elliott and all similarly situated persons who were advised and induced by their UBS Financial Advisor to purchase ARS not issued by an investment company that is registered or that filed a registration statement under the Investment Company Act of 1940.  Plaintiffs Mittman, Klokke and Elliott repeat and reiterate the allegations as set forth above as if set forth fully herein.

66.      Section 349 of the New York's General Business Law states:

Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

67.      As set forth above, Defendants' deceptive, acts, practices whereby defendants falsely represented to Plaintiffs Mittman, Klokke and Elliott and similarly situated Class members that they were bound by duties as Investment Advisors and Financial Advisors who would primarily advance the financial interests of their clients.  Defendants breached such duties by failing to continue to support Plaintiffs' ARS by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions, thereby freezing the ARS holdings of the Class in order to advance the financial interests of defendants at their clients' expense.  Defendants' conduct and actions, as described above, constitute deceptive business practices in violation of the GBL.

68.      The damages sustained by Plaintiffs Mittman, Klokke and Elliott and the other Class members were a direct and foreseeable result of, and were proximately caused by Defendants' deceptive business practices.

29

69.     As a result of Defendants' actions, Plaintiffs Mittman, Klokke and Elliott and other Class members have been injured and damaged in an amount to be determined at trial.

## COUNT III

### Negligent Misrepresentation
(Against Defendant UBS Financial)

70.     Plaintiffs Mittman, Klokke and Elliott and all similarly situated persons who were advised and induced by their UBS Financial Advisor to purchase ARS not issued by an investment company that is registered or that filed a registration statement under the Investment Company Act of 1940. Plaintiffs Mittman, Klokke and Elliott repeat and reiterate the allegations as set forth above as if set forth fully herein.

71.     Defendants' above-described misrepresentations, omissions and conduct in connection with Plaintiffs and other Class members investment in non-Investment Company ARS were false and misleading, in violation of their duties to Plaintiffs and the Class.

72.     Defendants were negligent in making the above-described misrepresentations, concealment and omissions of material facts.

73.     Defendants' misrepresentations and omissions concerning the ARS, including the liquidity risks inherent in ARS and the proper designation of ARS as short-term investment and not cash equivalents, were material in Plaintiffs' and the other Class members' decision include ARS as part of their cash management investment strategy.

74.     Plaintiffs and other Class members justifiably relied upon such misrepresentations, concealment and omissions to their damage and detriment.

75.     The damages sustained by Plaintiffs and the other Class members were a direct and foreseeable result of, and were proximately caused by, Defendants' misrepresentations, concealment and omissions.

76.     As a result of Defendants' actions, Plaintiffs and the other Class members have been damaged and injured in an amount to be determined at trial.

## COUNT IV

### Breach of Fiduciary Duty
(Against Defendant UBS Financial)

77.     Plaintiffs repeat and reiterate the allegations as set forth above except to exclude any and all allegations that Defendants made material misrepresentations and omission in connection with the purchase and sale of ARS securities set forth in ¶¶ 3, 34-35. This cause of action arises solely from allegations of alleged breach of fiduciary duties owed to Plaintiffs, including as alleged in ¶¶ 4, 39.

78.     Defendants, through their agents and representatives, held themselves out as financial advisors to Plaintiffs and other Class members, and as such owed fiduciary duties to Plaintiffs and the other Class members.  The Defendants breached their fiduciary duties by failing to continue to support Plaintiffs' ARS by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions, thereby freezing the ARS holdings of Plaintiffs and the Class in order to advance the financial interests of defendants at their clients' expense.

79.     As a result of Defendants' breach of fiduciary duties, Plaintiffs and other members of the Class have suffered damage in the form of lost earnings on their funds, and Defendants have profited at Plaintiffs' and the Class's expense in an amount to be determined at trial.  The damages sustained by Plaintiffs and other Class members were a direct and foreseeable result, and were proximately caused by, Defendants' breaches of their fiduciary duties.

80.     The Defendants' conduct was willful, wanton, and reckless.  Based on the intentionally dishonest nature of the Defendants' conduct, which was directed at the Class and at

the public generally, the Defendants should also be held liable to the Class for punitive damages, in an amount to be determined at trial.

## COUNT V

### Aiding and Abetting Breach of Fiduciary Duty
(Against Defendant UBS AG)

81.    Plaintiffs repeat and reiterate the allegations as set forth above except to exclude any and all allegations that Defendants made material misrepresentations and omission in connection with the purchase and sale of ARS securities set forth in ¶¶ 3, 34-35. This cause of action arises solely from allegations of alleged breach of fiduciary duties owed to Plaintiffs, including as alleged in ¶¶ 4, 39.

82.    As set forth above, Defendant UBS Financial breached its fiduciary duties to Plaintiffs and the Class.

83.    Defendant UBS AG, for its financial benefit, knew of, knowingly induced or participated in, permitted, and provided substantial assistance to, the fiduciary breaches by its subsidiary brokerage and by, *inter alia*, orchestrating and directing Defendant UBS Financial to participate in the ARS market, and reviewing and approving or ratifying UBS Financial's decision to fail to continue to support Plaintiffs' ARS by not  appearing, providing bids and otherwise participating in such regularly scheduled ARS auctions, thereby freezing the ARS holdings of Plaintiffs and the Class in order to advance the financial interests of Defendants.

84.    The damages sustained by Plaintiffs and the Class were a direct and foreseeable result of, and were proximately caused by Defendant UBS AG's aiding and abetting conduct.

85.    As a result of Defendant UBS AG's actions, Plaintiffs and the other members of the Class have been damaged and injured, and Defendant UBS AG and their subsidiaries have been unjustly benefited, in an amount to be determined at trial.

86.    Defendant UBS AG's conduct was willful, wanton, and reckless.  Based on the intentionally dishonest nature of Defendant UBS AG's conduct, which was directed at the Class and at the public generally, Defendant UBS AG should also be held liable to the Class for punitive damages in an amount to be determined at trial.

## COUNT VI

### Breach of the Implied Covenants of Good Faith and Fair Dealing
(Against Defendant UBS Financial)

87.    Plaintiffs repeat and reiterate the allegations as set forth above except to exclude any and all allegations that Defendants made material misrepresentations and omission in connection with the purchase and sale of ARS securities.  This cause of action arises solely from allegations of alleged breach of the implied covenants of good faith and fair dealing owed to Plaintiffs.

88.    In connection with the retention of UBS Financial Services as a financial or investment advisor or broker-dealer, there is an implied covenant of good faith and fair dealing on the part of UBS Financial to Plaintiff and the Class.

89.    UBS Financial breached the covenant of good faith and fair dealing by, among other things, by failing to continue to support Plaintiffs' ARS by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions, thereby freezing Plaintiffs' ARS holdings of the Class in order to advance the financial interests of defendants at their clients' expense.

90.    By reasons of the foregoing, Plaintiff and other members of the Class are entitled to compensatory damages in the amount to be determined at trial.

91.    Defendants' conduct was willful, wanton, and reckless.    Based on the intentionally dishonest nature of Defendants' conduct, which was directed at the Class and at the

public generally, the Defendants should be held liable to Plaintiffs and other Class members for actual damages as well as punitive damages in an amount to be determined at trial.

## COUNT VII

### Negligence
(Against Defendant UBS Financial)

92.    Plaintiffs repeat and reiterate the allegations as set forth above except to exclude any and all allegations that Defendants made material misrepresentations and omissions in connection with the purchase and sale of ARS securities set forth in ¶¶ 3, 34-35. This cause of action arises solely from allegations of alleged breach of fiduciary duties owed to Plaintiffs, including as alleged in ¶¶ 4, 39.

93.    The Defendants' held themselves out to be investment and financial advisors, owed to Plaintiffs and other Class members a duty of care including not to take steps to undermine the liquidity of Plaintiffs ARS holdings and to continue to participate in regularly scheduled ARS auctions.

94.    The Defendants breached their duty of care, *inter alia*, by failing to continue to support Plaintiffs' ARS by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions, thereby wiping out the liquidity of the Class in order to advance the financial interests of defendants at their clients' expense.

95.    The Defendants' conduct as described herein was, at minimum, negligent.

96.    The damages sustained by Plaintiffs and the other Class members were a direct and foreseeable result of, and were proximately caused by, Defendants' breaches of their duty and negligent conduct.

97.    As a result of the Defendants' actions, Plaintiffs and the other Class members have been damaged and injured, in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying the Named Plaintiffs as class representatives for the specified classes alleged herein under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Declaring that the Defendants' ARS transactions with the Plaintiffs and other member of the Class are void;

C.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Seeking disgorgement of any and all monies Defendants realized from the ARS transactions and auctions;

E.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including interest, counsel fees and expert fees; and

F.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  New York, New York
        May 27, 2008

SCHOENGOLD SPORN LAITMAN &
LOMETTI, P.C.

Samuel P. Sporn (SPS-4444)
Joel P. Laitman (JL-8177)
Frank R. Schirripa (FS-1960)
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile (212) 267-8137

*Attorneys for Plaintiffs and
Lead Counsel for the Proposed Class*

Of Counsel:

**FINKELSTEIN THOMPSON, LLP**
    Burton H. Finkelstein, Esq.
    Donald J. Enright, Esq.
    Michael G. McLellen, Esq.
    Elizabeth K. Tripodi, Esq.
1050 30th Street, N.W.
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

*Attorneys for Plaintiffs Rita Tubis
and Helena Tubis*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

| | | |
|---|---|---|
| RONALD D. KASSOVER, CHRIS JONES STEPHEN M. MITTMAN, RONALD E. KLOKKE, JAN SCHNEIDER, MARJORIE ELLIOTT, RITA TUBIS and HELENA TUBIS on behalf of themselves and all others similarly situated, | : : : : : : : : | No.    08-cv-02753 (LMM) |
| Plaintiff, | : : | |
| v. | : : | |
| UBS AG and UBS FINANCIAL SERVICES, INC., | : : | |
| Defendants. | : | |

-------------------------------------------------------------x

## CERTIFICATE OF SERVICE

I, Frank R. Schirripa, Esq., one of the counsel for Plaintiffs in the above-referenced action, hereby certify that on May 27, 2008, I filed Plaintiffs' Amended Class Action Complaint with the Clerk of the Court, emailed a copy of Plaintiffs' Amended Class Action Complaint to the Southern District of New York ECF clerk and served a copy of Plaintiffs' Amended Class Action Complaint by electronic mail and first class mail on Defendants' counsel listed below:

**PAUL, HASTINGS, JANOGSKY & WALKER, LLP**

Keith W. Miller
Jonathan A. Choa
75 East 55th Street
New York, NY 10022
Tel.: (212) 318-6451
Fax: (212) 230-7604
keithmiller@paulhastings.com
jonathanchoa@paulhastings.com

William F. Sullivan
515 South Flower St.

Los Angeles, CA 90071
Tel. (213) 683-6000
Fax (213) 996-3252
williamsullivan@paulhastings.com

*Attorneys for Defendants UBS AG and*
*UBS Financial Services, Inc.*

Frank R. Schirripa

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
RONALD D. KASSOVER, CHRIS JONES         :
STEPHEN M. MITTMAN, RONALD E.            :        No.    08-cv-02753 (LMM)
KLOKKE, JAN SCHNEIDER, MARJORIE          :
ELLIOTT, RITA TUBIS and HELENA TUBIS     :
on behalf of themselves and all others similarly   :
situated,                                :        ECF CASE
                                         :
              Plaintiff,                 :
                                         :
        v.                               :
                                         :
UBS AG and UBS FINANCIAL SERVICES, INC., :
                                         :
              Defendants.                :
-------------------------------------------------------------x

### PLAINTIFF'S FIRST REQUEST FOR THE
### PRODUCTION OF DOCUMENTS FROM DEFENDANTS

C O U N S E L O R S :

        PLEASE TAKE NOTICE that, pursuant to Rule 34 of the Federal Rules of Civil

Procedure ("Federal Rules"), Plaintiff Ronald D. Kassover ("Plaintiff"), through his attorneys,

request that defendants UBS AG and UBS Financial Services, Inc. ("UBS Financial")

(collectively, the "Defendants") produce and permit them to inspect and copy the documents

described below. The production should be made no later than June 26, 2008 in accordance with

the Federal Rules at the offices of Schoengold Sporn Laitman & Lometti, P.C., 19 Fulton Street,

Suite 406, New York, New York 10038. Plaintiffs reserve their right to clarify, amend, modify

or supplement the document request as they obtain further information in discovery.

### DEFINITIONS

        1.      "You" or "Your" means Defendants, their subsidiaries, divisions, subdivisions,

joint ventures, affiliated persons, and predecessors, and all present and former directors, officers,

employees, representatives, agents and other persons acting on behalf of any of the foregoing.

2.    "Auction-Rate Securities" means long-term municipal bonds that are subject to periodic auctions to reset their interest rate.

3.    "Complaint" means the First Amended Class Action Complaint filed on or about May 27, 2008.

4.    "Communication" or "communicate" mean the origination, exchange and/or transfer of all information (whether it be in writing, telephonic, oral and/or e-mail mode in the form of facts, ideas, inquiries, directives, policy guidelines, design changes, reports to any governmental authorities or otherwise). All communications created and/or kept in electronic form must be produced in their native electronic form as required by Fed. R. Civ. P. 34(b), including without limitation any form of digital communications, including without limitation, electronic mail, instant messaging, workgroup communications programs, discussion threads and internet and intranet blog sites.

5.    "Concerning" means relating to, referring to, describing, discussing, evidencing or constituting.

6.    "Document" shall have the broadest possible meaning pursuant to Fed. R. Civ. P. 34(a). Consistent with the above definition, the term document shall include, without limitation, any written, printed, typed, photostatic, photographed, recorded, computer-generated, computer-stored, or otherwise maintained or reproduced communication or representation, any data compilation in any form, whether comprised of letters, words, numbers, pictures, sounds, bytes, e-mails, electronic signals or impulses, electronic data, active files, deleted files, file fragments, or any combination thereof.  All documents created and/or kept in electronic form must be produced in their native electronic form as required by Fed. R. Civ. P. 34(b).

7.      "Person" is defined as any natural person or any business, legal or governmental entity or association.

8.      "All" and "Each" shall be construed as all and each.

9.      "And" and "Or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that might otherwise be construed to be outside of its scope.

10.      The use of the singular shall be construed to including the plural and use of the plural shall be deemed to include the singular.

## INSTRUCTIONS

1.      In responding to these requests, you shall furnish all responsive documents and shall supplement your responses whenever necessary, in accordance with the requirements of Rule 26(e) of the Federal Rules of Civil Procedure.

2.      Reference to an individual, partnership or corporation includes, in addition, any and all agents, employees, representatives, attorneys and all other persons or entities acting or purporting to act on his, her or its behalf or under his, her or its control.

3.      Pursuant to Rule 26(b) of the Federal Rules of Civil Procedure and Local Civil Rule 33.1(c), where a claim of privilege is asserted in response to any document request, or subpart thereof, and a document is not provided on the basis of such assertion, for each document not provided, the party asserting the privilege shall state the following:

a.      the identity of the party asserting the privilege;

b.      the privilege that it is contended protects the document requested from disclosure;

c.      the date(s) the document was created, sent and/or received;

3

d.    the name, the present or last known home and business addresses, the telephone numbers, the title (or position), and the occupation of those individuals who prepared, produced, or reproduced, or who were recipients of, said document and the relationship between said individuals;

e.    a description of the document sufficient to identify it without revealing the information with respect to which the privilege is claimed, including the general subject matter of the document;

f.    the location of the documents;

g.    the custodian of the documents; and

h.    each and every fact or basis upon which the respondent claim any such privilege.

4.    In responding to these requests, you shall furnish all responsive documents in the form they were kept in the regular course of business, including that data kept in electronic or digital format should be produced in that format in accordance with Fed. R. Civ. P. 34(b).

## TIME PERIOD

Unless otherwise specifically indicated, all requests herein refer to the period January 1, 2000 through the date of service of this Document Request (the "Period"), and shall include all documents which concern the Period in whole or in part, even though they were prepared, published, dated or received before or after the Period.

## DOCUMENT REQUESTS

1.    All documents already produced or to be produced to governmental agencies in connection with their investigation of Your role in recommending, selling, purchasing and/or marketing Auction-Rate Securities and Your participation in the Auction-Rate Securities

market, including without limitation, documents provided by You to:

     a.    the United States Securities and Exchange Commission;

     b.    the United States Federal Bureau of Investigation;

     c.    the Financial Industry Regulatory Authority, otherwise known as "FINRA";

     d.    the Attorney General of the State of New York; and

     e.    the Commonwealth of Massachusetts.

DATED:  New York, New York
          May 27, 2008

                      **SCHOENGOLD SPORN LAITMAN & LOMETTI, P.C.**

                      Samuel P. Sporn (SPS-4444)
                      Joel P. Laitman (JL-8177)
                      Frank R. Schirripa (FS-1960)
                      19 Fulton Street, Suite 406
                      New York, New York 10038
                      Telephone: (212) 964-0046
                      Facsimile (212) 267-8137

                      *Attorneys for Plaintiff and*
                      *Lead Counsel for the Proposed Class*

## CERTIFICATE OF SERVICE

I, Frank R. Schirripa, Esq., one of the counsel for Plaintiffs in the above-referenced action, hereby certify that on May 27, 2008, I sent by electronic mail, facsimile and first-class mail a true and correct copy of Plaintiffs' First Request for the Production of Documents from Defendants to the following counsel listed below:

**PAUL, HASTINGS, JANOGSKY &
WALKER, LLP**

Keith W. Miller
Jonathan A. Choa
75 East 55th Street
New York, NY 10022
Tel.: (212) 318-6451
Fax: (212) 230-7604
keithmiller@paulhastings.com
jonathanchoa@paulhastings.com

William F. Sullivan
515 South Flower St.
Los Angeles, CA 90071
Tel. (213) 683-6000
Fax (213) 996-3252
williamsullivan@paulhastings.com

*Attorneys for Defendants UBS AG and
UBS Financial Services, Inc.*

Frank R. Schirripa

# EXHIBIT C

Case 1:08-cv-04352-LMM   Document 12-4   Filed 06/09/2008   Page 1 of Page 2 of 5
Case 1:08-cv-02967-LMM   Document 13   Filed 05/16/2008   Page 1 of 3

Case 1:08-cv-02967-LMM   Document 12   Filed 05/15/2008   Page 1 of 4

*McKenna, J.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID and SHELLY CHANDLER, Individually, And As Trustees of the Chandler Trust Dated 12/28/2005, And On Behalf of All Others Similarly Situated, <br> Plaintiffs, <br><br> v. <br><br> UBS AG, UBS Securities LLC and UBS Financial Services Inc., <br><br> Defendants. | CIVIL ACTION NO. 08-CV-02967 (LMM) <br><br> USDC SDNY <br> DOCUMENT <br> ELECTRONICALLY FILED <br> DOC #: _____ <br> DATE FILED: 5/16/08 |
| RICARDO L. SANCHEZ, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> UBS AG, UBS Securities LLC and UBS Financial Services Inc., <br><br> Defendants. | CIVIL ACTION NO. 08-CV-03082 (LMM) <br><br> +ORDER OF <br> STIPULATION REQUESTING CONSOLIDATION OF RELATED CASES |

WHEREAS on March 21, 2008, Plaintiffs David and Shelley Chandler filed the action styled *David and Shelley Chandler, Individually, and As Trustees of the Chandler Trust Dated 12/28/2005, And on Behalf of All Others Similarly Situated v. UBS AG, UBS Securities LLC and UBS Financial Services, Inc.*, No. 08-CV-02967 (LMM) ("*Chandler*");

WHEREAS on March 26, 2008, Plaintiff Ricardo L. Sanchez filed the action styled *Ricardo L. Sanchez, On Behalf of Himself and All Others Similarly Situated v. UBS AG, UBS Securities LLC and UBS Financial Services, Inc.*, No. 08-CV-03082 (LMM) ("*Sanchez*");

WHEREAS the *Chandler* and *Sanchez* actions involve common questions of law and fact;

WHEREAS the *Chandler* and *Sanchez* parties have agreed to consolidate their cases;

THEREFORE IT IS HEREBY STIPULATED AND AGREED by the parties, by and through their undersigned counsel, that:

1.    The *Chandler* and *Sanchez* actions are hereby consolidated for all purposes, including discovery, pretrial proceedings, trial proceedings, and post-trial proceedings, pursuant to Rule 42(a) of the Federal Rules of Civil Procedure;

2.    This action shall be captioned "*In re UBS Auction Rate Securities Litigation*," and the files of this action shall be maintained in one file under Master File No. 08-CV-02967. Any other actions now pending or hereafter filed in this District, or transferred to this District, which arise out of common alleged facts and include the same alleged claims against Defendants as alleged in the *Chandler* and *Sanchez* cases, shall be consolidated into this action for all purposes, if and when they are drawn to the Court's attention.

3.    This order is without prejudice to the rights of any party to apply to the Court for severance of any claim, issue, party or action, or for modification of this Order, for good cause shown.

4.    Every pleading filed in these consolidated actions, or in any separate action included herein, shall bear the following caption:

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re UBS AUCTION RATE SECURITIES LITIGATION | ) ) ) | Master File No. 08-CV-02967 |
| This Document Relates To: | ) ) ) | |

5.    When a pleading is intended to be applicable to all actions to which this Order applies, the words "All Actions" shall appear immediately after the words "This Document

2

Relates To:" in the caption set out above.  When a pleading is intended to be applicable to some, but not all, of the consolidated actions, immediately after the words "This Document Relates To:" in the caption described above, there shall appear "Civil Action No. _____ (plaintiff's name)" for each individual related action to which the pleading is intended to be applicable.

IT IS SO STIPULATED.

Dated: May 15, 2008             GIRARD GIBBS LLP

                                By: _____

                                Jonathan K. Levine (JL-8390)
                                Daniel C. Girard
                                Aaron M. Sheanin
                                601 California Street, 14th Floor
                                San Francisco, CA 94108
                                Telephone:  (415) 981-4800
                                Facsimile:  (415) 981-4846

                                Christopher A. Seeger (CS-4880)
                                Stephen A. Weiss (SW-3520)
                                David R. Buchanan (DB-6368)
                                SEEGER WEISS LLP
                                One William Street
                                New York, NY 10004
                                Telephone:  (212) 584-0700
                                     Facsimile:  (212) 584-0799

                                Norman E. Siegel
                                STUEVE SIEGEL HANSON LLP
                                460 Nichols Road, Suite 200
                                Kansas City, MO, 64112
                                Telephone: (816) 714-7100
                                Facsimile: (816) 714-7101

                                Counsel for Plaintiffs
                                David and Shelly Chandler

Dated:  May 14, 2008            LEVI & KORSINSKY, LLP

                                By: _____

                                Eduard Korsinsky
                                Joseph E. Levi
                                Juan E. Monteverde

3

39 Broadway, Suite 1601
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

Attorneys for Plaintiff Ricardo Sanchez

Dated: May 15, 2008

PAUL, HASTINGS, JANOFSKY & WALKER LLP

By: _William F. Sullivan / HMP_

William F. Sullivan
Howard M. Privette
John S. Durant
515 S. Flower Street, 25th Floor
Los Angeles, California 90071
(213) 683-6000

Keith Miller
75 East 55th Street
New York, New York 10022
(212) 318-6000

James D. Wareham
875 15th Street, N.W.
Washington, D.C. 20005
(202) 551-1700

Attorneys for Defendants UBS Securities LLC and
UBS Financial Services Inc.

SO ORDERED:

_____   5/16/08
LAWRENCE M. McKENNA
United States District Judge

4