UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X
                                    :
In re UBS AUCTION RATE SECURITIES   :
LITIGATION                          :
                                    :
- - - - - - - - - - - - - - - - - -X
                                    :  08 CV 2967 (LMM)
THIS MEMORANDUM AND ORDER APPLIES   :  MEMORANDUM AND ORDER
TO:  Nos. 08-CV-2967, 08-CV-3082,   :
08-CV-4352, 08-CV-5251              :
                                    :
- - - - - - - - - - - - - - - - - -X

```
┌──────────────────────────────┐
│ USDC SDNY                     │
│ DOCUMENT                      │
│ ELECTRONICALLY FILED          │
│ DOC #: _____         │
│ DATE FILED: 3/30/09           │
└──────────────────────────────┘
```

McKENNA, D.J.

     Plaintiffs in this putative class action sue UBS

Financial Services ("UBS FS"), UBS Securities LLC, and UBS

AG (collectively, "UBS") and several UBS executives – David

Shulman, Joseph Scoby, Marcel Rohner, and Marten Hoekstra

(collectively, "the Individual Defendants") – pursuant to §

10(b) of the Securities Exchange Act of 1934 ("Exchange

Act"), 15 U.S.C. § 78(j)(b), and Securities and Exchange

Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated

thereunder, and for control person liability pursuant to

Exchange Act § 20(a), 15 U.S.C. § 78t(a).

     Plaintiffs purchased from UBS FS auction rate

securities ("ARS") for which UBS Securities managed

periodic auctions where the securities traded. Plaintiffs'

securities fraud claims are based on misrepresentations and

omissions regarding the liquidity of the ARS and the ARS
auction market and UBS's involvement in ARS auctions.
UBS's manipulation of the ARS market through its regular
participation in the auctions also serves as a basis for
Plaintiffs' claims.  Defendants move to dismiss all claims
pursuant to Federal Rule of Civil Procedure 12(b)(6).  For
the reasons set forth below, Defendants' motion to dismiss
is GRANTED.

## I.    PROCEDURAL BACKGROUND

On March 21, 2008, David and Shelly Chandler filed a
putative class action Complaint against the Corporate
Defendants alleging securities fraud.  Two additional
putative class action lawsuits against Defendants were
subsequently filed.  The Court consolidated the lawsuits
under the caption In re UBS Auction Rate Securities
Litigation and appointed the Chandler Group as Lead
Plaintiffs.  On September 5, 2008, Plaintiffs filed the
Consolidated Class Action Amended Complaint ("the
Complaint").  Defendants filed their motions to dismiss on
November 25, 2008 and thereafter.

## II.   FACTUAL BACKGROUND

2

The factual allegations are detailed in the Complaint, familiarity with which is presumed for purposes of this Motion. The following summary of facts reflects an undisputed or otherwise uncontested version of the facts and draws all attendant inferences in Plaintiffs' favor. See Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006).

ARS are preferred stock or long-term debt instruments for which interest rates or dividends are determined at periodic auctions where ARS holders can sell their ARS if demand is sufficient. (Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Compl.") ¶¶ 43-45, 58) Auctions for UBS's ARS were typically held between every seven and thirty five days. (Id. ¶ 54.)

At these "Dutch auctions" the broker-dealer managing the auction (here, UBS) matched all sell and buy orders in order of ascending rates or dividends until all ARS were sold. (Id. ¶ 55.) The highest rate at which all ARS were sold was the "clearing rate" - the rate at which all ARS for sale at that auction changed hands. (Id.) If there was insufficient demand for ARS at a given auction, a "failed auction" occurred, and no ARS were exchanged. (Id. ¶ 62.) A failed auction triggered a "maximum rate" (specified in the ARS issuers' offering documents) at which

unsuccessful sellers earned interest or dividends until the
next auction. (Id.) The maximum rate was intended to
attract buyers and improve liquidity after a failed
auction.  (Id. ¶ 63.)  If this maximum rate failed to
attract ARS buyers to subsequent auctions, broker-dealers
generally intervened as buyers to prevent auction failures
and provide liquidity.  (Id.)

     UBS underwrote ARS issues with maximum rates that were
too low to attract liquidity to the ARS market, so UBS
found itself playing an increasingly frequent and sizable
role in providing liquidity for its ARS.  (Id. ¶¶ 65, 68-
69.)  Between January 1, 2006 and February 28, 2008, UBS
intervened more than 50,000 times in ARS auctions and
prevented failures in the majority of those auctions.  (Id.
¶¶  68-69.)

     UBS failed to disclose to Plaintiffs the frequency
with which it intervened in auctions and that massive
auction failure would have resulted absent UBS's
intervention.  (Compl. ¶¶ 71-74.)  In addition, UBS
Securities, as the manager of the auctions, had knowledge
of all bid rates at a given auction and was able to set
clearing rates just high enough to clear the auctions, but
below levels that compensated Plaintiffs for the liquidity
risks in the ARS market. (Id.  ¶¶ 77, 80, 83.)  Plaintiffs

were thereby deprived of the return on their investments.
(Id. ¶ 83.)

UBS's continued intervention in the auctions resulted
in its accumulation of high levels of ARS inventory. (Id.
¶¶ 90-91.) As the credit markets deteriorated in 2007, UBS
became increasingly sensitive to the level of its exposure
to the ARS market and sought to reduce its inventory
levels. (Id.) On or about February 13, 2008, UBS and
other major broker-dealers ceased supporting the auctions,
resulting in widespread auction failure. (Id. ¶¶ 140-41.)
Plaintiffs were left holding ARS that were rendered
illiquid. (Id. ¶ 145.)

On August 8, 2008, UBS announced that it had entered
into a settlement-in-principle ("the Regulatory Agreement")
with state and federal regulators and law enforcement to
restore liquidity to its investors' ARS holdings. (Id. ¶
148.) Terms of the Regulatory Agreement include 1) the
right to elect UBS repurchase of all ARS shares at par
value (the price paid, in this case $25,000 per share of
ARS), 2) for investors who resold their ARS at a discount,
the right to receive the difference between par value and
the price at which the investor sold the ARS, and 3) the
right to arbitrate claims for consequential damages at
FINRA. (Sullivan Decl., Ex. B 85-90.) Under the Regulatory

Agreement, Lead Plaintiffs in this action have already received a refund of the purchase price of their ARS and have retained the interest and/or dividends they received during the time they held the ARS.  (Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("Pl.'s Mem.") 9-10.)

### III. DISCUSSION

#### A.  Motion to Dismiss Standard

A complaint should be dismissed if it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "In deciding a motion to dismiss, the Court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor."  In re Parmalat Sec. Litig., 501 F.Supp.2d 560, 560 (S.D.N.Y. 2007).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007)).

Plaintiffs' securities fraud claims are subject to additional pleading requirements.  Plaintiffs' § 10(b)

6

claims are subject to the heightened pleading standard of
Rule 9(b), which requires that allegations of fraud must be
stated with particularity. Fed. R. Civ. P. 9(b).  These
claims are also subject to the heightened pleading standard
of the PSLRA, ATSI Commc'ns, 493 F.3d at 99, which requires
that for any action for money damages that requires proof
of scienter, a plaintiff must "state with particularity
facts giving rise to a strong inference that the defendant
acted with the required state of mind."  15 U.S.C. § 78u-
4(b)(2).  Finally, to allege control person liability under
§ 20(a), Plaintiffs' must allege "some level of culpable
participation at least approximating recklessness in the
section 10(b) context . . . ."  Lapin v. Goldman Sachs
Group, Inc., 506 F. Supp. 2d 221, 248 (S.D.N.Y. 2006).

     Generally, "the court is not permitted to consider
factual matters submitted outside of the complaint unless
the parties are given notice that the motion to dismiss is
being converted to a motion for summary judgment under Rule
56 and are afforded an opportunity to submit additional
affidavits."  Campo v. 1st Nationwide Bank, 857 F.Supp. 264,
269 (E.D.N.Y. 1994).  However, "[i]n certain circumstances,
the court may permissibly consider documents other than the
complaint in ruling on a motion under Rule 12(b)(6).
Documents that are attached to the complaint or

incorporated in it by reference are deemed part of the
pleading and may be considered." Roth v. Jennings, 489
F.3d 499, 509 (2d Cir. 2007) (citing Pani v. Empire Blue
Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998), cert.
denied, 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d. 770
(1999)).

## B.  Section 10(b) Claims

Plaintiffs allege § 10(b) violations against all
Defendants based on material misstatements and omissions
and market manipulation.  To state a cause of action for
either material misstatement or omission or for market
manipulation under § 10(b) and Rule 10b-5, a plaintiff must
plead a theory of damages cognizable under the Rule.  See
e.g., Millowitz v. Citigroup Global Markets, Inc. (In re
Salomon Analyst Metromedia Litig.), 544 F.3d 474, 478 n.1
(2d Cir. 2008) (stating that economic loss must be alleged
in a § 10(b) claim based on misrepresentation or omission);
Vogel v. Sands Bros. & Co., 126 F. Supp. 2d, 730, 737
(S.D.N.Y. 2001) (stating that "damage" must be alleged in a
§ 10(b) claim based on market manipulation).  While § 28(a)
of the Exchange Act limits § 10(b) recovery to "actual
damages," the statute does not indicate the proper method
to measure damages.  McMahan & Co. v. Wherehouse

Entertainment, 65 F.3d 1044, 1049 (2d Cir. 1995). Section
28(a)'s "actual damages" limitation serves to bar
speculative recoveries, but otherwise contemplates that
district courts will use discretion to fashion a measure of
damages appropriate for the circumstances. See Panos v.
Island Gem Enters., 880 F. Supp. 169, 175 (S.D.N.Y. 1995).

Consistent with the latitude afforded courts under §
28(a), courts have fashioned relief using various measures,
including out-of-pocket and benefit-of-the-bargain damages
and rescission. See id. ("courts have interpreted the
statute as permitting all forms of loss-based relief,
whether articulated under out-of-pocket, benefit-of-the-
bargain, or other loss theories."); JSMS Rural LP v. GMG
Capital Partners III, LP, 2006 WL 1867482, *4 (S.D.N.Y.
July 6, 2006) ("Courts have cautiously endorsed rescission
as a possible remedy for some Rule 10b-5 violations.").
But appropriate grounds for damages in § 10(b) actions are
not limitless, and courts have required plaintiffs to
choose between rescinding a transaction and being paid
restitution on the one hand and holding the defrauder to
the bargain and recovering out-of-pocket losses resulting
from the fraudulent transaction on the other hand. See
e.g., Randall v. Loftsgaarden, 478 U.S. 647, 662 (1986)
("there is authority for allowing the § 10(b) plaintiff, at

least in some circumstances, to choose between undoing the
bargain . . . or holding the defendant to the bargain by
requiring him to pay [out-of-pocket] damages.")
(alterations in original) (citation omitted).

In this action, Plaintiffs allege that "[a]s a result
of Defendants' devices, schemes and artifices to defraud,
and acts, practices and course of business, the market
price of UBS Auction Rate Securities failed to reflect a
fair or just price of those securities and was artificially
inflated during the Class Period." (Compl. ¶ 307.)
Plaintiffs clarify their damages allegation in their motion
papers, arguing they have been damaged because "Defendants
manipulated interest rates paid on ARS, causing them to be
lower, both before and after the collapse of the ARS
market, than the rates a non-rigged market would have
placed on those securities had the truth been disclosed."
(Pls.' Mem. 9.) Plaintiffs further explain that they "did
not receive the yield - the price they paid for ARS plus an
interest rate that reflected the risks of holding those
securities - that they would have received in the absence
of UBS's manipulative conduct. Rather, Plaintiffs and the
Class paid prices or received interest rates that were not
based on the natural interplay of supply and demand." (Id.
at 10-11) (quotations omitted).

To justify their damages allegations after availing
themselves of the relief in the Regulatory Agreement,
Plaintiffs attempt to characterize their damages as out-of-
pocket damages. (Id. at 10.) The out-of-pocket measure of
damages – the price paid for the security less the
security's value on the date of the transaction and absent
any fraud – sounds in tort. Panos, 880 F. Supp. at 176.
See also Levine, 439 F.2d at 334 (indicating that the
standard rule for damages in 10b-5 cases is "the excess of
what he paid over the value of what he got, not, as some
other courts had held, the difference between the value of
what he got and what it was represented he would be
getting"). The purpose of out-of-pocket relief is to
restore the plaintiff to the position he was in before the
fraud. Panos, 880 F. Supp. at 176.

Given that Plaintiffs have availed themselves of the
relief provided for in the Regulatory Agreement, Plaintiffs
cannot now allege out-of-pocket damages. When Plaintiffs
elected to have UBS buyback their ARS at par value, they
received a full refund of the purchase price. Therefore,
Plaintiffs have already been returned to the position they
were in before they purchased the ARS and before any fraud
ensued. They paid $25,000 per share for ARS and have now
received $25,000 per share plus the interest or dividends

11

the ARS accrued during the period Plaintiffs held them.
And though Plaintiffs allege that they "overpaid" for the
ARS, the full refund they received certainly accounted for
an inflated purchase price.  In sum, Plaintiffs' out-of-
pocket damages are necessarily zero because after choosing
to rescind the ARS purchases, Plaintiffs have effectively
paid nothing for their ARS.

Plaintiffs aver, and of course this Court credits
their allegation, that UBS's fraudulent acts prevented
Plaintiffs from receiving a sufficiently high rate of
interest or dividends to compensate them for the risk of
illiquidity associated with their ARS investments.  But
this theory of damages is not consistent with the out-of-
pocket measure; instead Plaintiffs' theory of damages is
consistent with the benefit-of-the-bargain measure.
Benefit-of-the-bargain damages are measured as the value of
the security as represented by the defendant at the time of
the sale less the security's actual value at that time.
Panos, 880 F. Supp. at 176.  This measure sounds in
contract principles and is commonly referred to as
expectation damages.  Id.  The aim of benefit-of-the-
bargain damages is to "put an injured plaintiff in the
position he would have been in had his expectancy ensued."
Id.

12

In this case, Plaintiffs expected to receive interest or dividends that were "based on the natural interplay of supply and demand." (Pls.' Mem. 11.)  Instead, Plaintiffs received interest and dividends at artificially depressed levels due to UBS's auction manipulation.  (Id. at 10-11.) Plaintiffs allege damages in the amount of the difference between the interest and dividends they would have received absent UBS's fraudulent conduct and the lower returns they received due to UBS's fraudulent conduct.  Plaintiffs' damages allegation fits precisely within the benefit-of-the-bargain theory of damages.  They seek to recover that which they were entitled to receive when they purchased ARS, but Plaintiffs' acceptance of a full refund of the purchase price of the ARS operated to rescind those purchases.  Therein lies the fatal flaw in Plaintiffs' damages allegations.

> A defrauded plaintiff has the option of rescinding a transaction and being restored to his prior position, or of affirming the transaction and suing for the damages suffered.  Rescission and restitution are alternatives to money damages; a plaintiff cannot both rescind a transaction and ask for the benefit of the bargain rescinded. Instead, if a transaction is rescinded a plaintiff is only entitled to that which is necessary to restore him to his earlier position.

Kauffmann v. Yoskowitz, 1989 WL 79364, *8 (S.D.N.Y. July 13, 1989) (quoting Quintel Corp., N.V. v. Citibank, N.A., 596 F. Supp. 797, 803 (S.D.N.Y. 1984)) (emphasis in original).

Plaintiffs in this action may not now seek additional interest or dividends as benefits of ARS purchases they have already elected to disavow.  As discussed above, Plaintiffs have already been restored to the position they were in before UBS's fraudulent conduct.  Given their election of the rescission under the Regulatory Agreement, Plaintiffs are entitled to no more.  See id.

Finally, Plaintiffs' remaining damages allegation fails for lack of constitutional standing.  Plaintiffs allege damages on the basis that "[e]xcluded from the buy-back are Class members who purchased UBS-underwritten ARS from brokerage firms other than UBS, and investors who transferred to another brokerage firm ARS they purchased from UBS before October 2007.  These Class members have claims for rescission as well as for underpayment of interest."  (Pls.' Mem. 10.)

The Second Circuit's recent decision in W. R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100 (2d Cir. N.Y. 2008), clearly precludes Plaintiffs from bringing causes of actions based on injuries they have not

14

personally suffered, but that they allege on behalf of

other members of the Class.

> [D]istrict courts should be mindful
> that named plaintiffs in a class action
> "must allege and show that they
> personally have been injured, not that
> injury has been suffered by other,
> unidentified members of the class to
> which they belong and which they
> purport to represent. Unless [they]
> can thus demonstrate the requisite case
> or controversy between themselves
> personally and [defendants], 'none may
> seek relief on behalf of himself or any
> other member of the class.'"

Huff, 549 F.3d at 106 n.5 (quoting Warth v. Seldin, 422

U.S. 490, 502 (1975)) (alterations in original).

Plaintiffs in this action have not suffered the injuries

they allege on behalf of these Class members, as they

concede that "[a]lthough securities regulators recently

forced UBS to repurchase ARS at par value from a portion of

the Class, including Plaintiffs, many Class members

continue to hold illiquid ARS." (Pls. Mem. 9-10) (emphasis

added). As Plaintiffs have failed to allege any injury

they personally suffered, they lack standing to bring §

10(b) claims on this theory of damages. See id.

In sum, because Plaintiffs fail to allege any theory of

damages cognizable under § 10(b) and because Plaintiffs

have no constitutional standing to assert the damages they

15

allege on behalf of Class members, Plaintiffs' § 10(b)
claims must be dismissed.

## C. Control Person Liability

Plaintiffs allege § 20(a) control person liability
against UBS AG, UBS Securities, and the Individual
Defendants. "Because under § 20(a), controlling persons
are liable only jointly and severally with the primary
violators for damages caused by the primary violation, [a
plaintiff] can recover no more from the defendants than the
actual damages he suffered . . . ." Boguslavsky v. Kaplan,
159 F.3d 715, 721 (2d Cir. 1998). As Plaintiffs cannot
successfully allege damages under § 10(b), there can be no
recovery for control person liability under § 20(a). See
id.

## IV. ORDER

For the foregoing reasons, Defendants' Motion to
Dismiss is GRANTED. Plaintiffs may replead (if they can do
so consistently with Federal Rule of Civil Procedure 11)
within 20 days of the date hereof.

SO ORDERED.

Dated: 3/30/09

Lawrence M. McKenna
U.S.D.J.